IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 11-cv-02202-RBJ-KMT

GILBERT E. GARCIA,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

---

ORDER

---

This case is before the Court on the plaintiff's objection [docket #20] to the recommendation of United States Magistrate Judge Kathleen M. Tafoya [#19] that the decision of the Commissioner to deny Mr. Garcia's application for disability benefits be affirmed.

**Facts**

Gilbert E. Garcia was born on August 20, 1946. After graduating from high school in 1964, and obtaining an Associate of Arts Degree at Trinidad State Junior College, he had a long and successful career. Notably, for many years he worked for the Gillette Company, beginning as a retail sales representative, and after eight years, being promoted to a manager, then district manager, where he trained and supervised several others. His work for Gillette required that he be in retail stores such as Wal-Mart, Target, King Soopers, and Safeway four days a week helping to market Gillette products. He spent Fridays in an office completing paperwork. He loved his job, and he received commendations including being named sales representative of the year nationally one time. On six occasions his "numbers" exceeded his objectives by a sufficient

margin that he achieved the "Winner's Circle" and was rewarded with nice trips for him and his wife.

Unfortunately, in about 2000, at the age of 54, Mr. Garcia's hearing began to deteriorate. R. 162. Despite being fitted for hearing aids, by about 2004 he was making mistakes at work that he had not made previously, primarily because of his hearing loss, causing his performance to drop from an A+ to a C in his estimation. R. 33-35. Daniel Goulet, who was Mr. Garcia's supervisor at Gillette from 2000 to 2006, submitted a letter describing Mr. Garcia as an exceptional employee. However, "[t]he only issue that Gilbert faced was the acceleration of his hearing loss which caused Gilbert to miss on many opportunities to showcase his many talents such as conducting seminars, actively participate in working group sessions, etc." R. 186. Mr. Goulet describes sitting with Mr. Garcia at sales functions and repeating what was being said, because Mr. Garcia couldn't hear it. His hearing loss caused him to miss deadlines, because he didn't properly hear the instructions. *Id.* Similarly, Steven Pettinelli, who supervised Mr. Garcia from 2006 through 2007, after Procter & Gamble had acquired Gillette, submitted a letter indicating that Mr. Garcia experienced a continual loss of hearing that caused him to miss assignments and directions. R. 189.

Mr. Garcia had similar problems at home. He couldn't hear his wife from the next room. He could hear the T.V. with headphones. He and his wife could not hear each other in restaurants unless it was quiet. He had difficulty having a conversation with his nine-year old grandson. R. 36-38. Mr. Garcia's wife testified that he could not hear the doorbell ringing. He could participate in a telephone conversation in a controlled environment, using the volume control, but if someone left a message, she would have to listen to it and interpret it for him. He could not make out the words on T.V. unless it was really loud or he used headphone. R. 38-40.

In 2007, Mr. Garcia, by then age 61, was offered and accepted a "buyout," thus ending his employment. He believes that he would have been fired within six months if he had not accepted the buyout. R.36. He believes that he could physically have continued doing the job but for his hearing. However, he no longer could work in a retail environment, where he would have to hear and follow a manager's directions. R. 36.

Mr. Garcia applied for disability benefits on December 18, 2008, claiming a date of onset of disability of September 30, 2007. R. 111. This coincided with the date of his buyout by Procter & Gamble. The Field Office's "Disability Report," completed on the date of filing, shows a Date Last Insured of July 31, 2012. R. 135. The interviewer noted that she had to raise her voice in order for Mr. Garcia to hear her, and that he had trouble hearing if she was not looking directly at him. R.136. Mr. Garcia recounted his difficulties hearing conversations, missing assignments, and being unable to work in areas with background noise. R. 139. He described his job at Gillette/Procter & Gamble as requiring standing or walking up to five hours a day, sitting, stooping, kneeling, crouching, grasping objects, reaching, writing, and lifting up to 50 pounds, 25 pounds frequently. R. 140.

In terms of daily functioning Mr. Garcia indicated that he cleans up, has breakfast; takes care of chores; goes grocery shopping; helps with house cleaning, laundry and repairs; vacuums, starts dinner, and helps clean up. His hobbies including golfing once a week in the summer; hunting once a year in season; football games; watching sporting events on T.V., although less than before because of his hearing difficulty; and reading. He enjoyed conversing with members of his family without having a lot of "what's" and "please repeats" before his hearing loss. He goes to church weekly and mows the lawn. On a daily basis he checks the computer for e-mail and looks for information, presumably on the Internet. He handles his bank account and pays

bills. He and his wife rarely have dinner out with other people, because hearing them is very difficult. They seldom go to movies because he can't understand a lot of the conversation. R. 156-63.

On the other hand, Mr. Garcia indicated that he follows written instructions very well, and that he follows spoken instructions very well as long as he understands them. R. 161. He gets along very well with authority figures. R. 162. His ability to handle stress is, by his assessment, "average." R. 162.

Mr. Garcia identified Tod Sweeney, M.D. as the physician whom he had been seeing for general care, including hearing loss, and John Wilson, M.A. CCC-A, as a hearing specialist whom he had been seeing since February 2, 2006, with his most recent hearing test having been administered on December 1, 2008. R. 141-43.

Mr. Garcia submitted an audiogram conducted by HearingLife USA, Inc. on December 1, 2008, R. 190-91; a report from Mr. Wilson, the hearing specialist, who evaluated the audiogram and reported "moderate to severe high frequency sensorineural hearing loss bilaterally and adjusted Mr. Garcia's hearing aids, R. 192; a report dated March 10, 2009 from Betty F. Sweetman, M.A. of Disability Determination Services, who assessment Mr. Garcia with a mild sloping to profound sensorineural hearing loss "who functions well with his hearing aids in quiet settings," R. 193-96; and a report from Nicolette A. Picerno, M.D., of Associates of Otolaryngology, who interpreted his audiogram as revealing moderate sloping to severe sensorineural hearing loss. R. 197. Dr. Picerno stated that Mr. Garcia's "ability to hear loud warnings and receive information when spoken to loudly in a one-on-one situation is good," and that his ability to "provide speech which can be easily heard, understood and sustained is

4

normal." *Id.* She did note that Mr. Garcia does not know or use American Sign Language or lip reading. *Id.*

On April 17, 2009 Mr. Garcia's claim was denied by the Social Security Administration's Regional Office. R. 65-67. Mr. Garcia requested a hearing by an Administrative Law Judge. R. 74. The ALJ hearing was held on June 25, 2010. In addition to Mr. and Mrs. Garcia, the ALJ heard testimony from a vocational expert, Robert Schmidt. Mr. Schmidt classified Mr. Garcia's past work as a retail sales representative as SVP 5, "light exertional," and as an area retail manager SVP 8, "sedentary." Mr. Schmidt testified that a person who is limited in hearing so that he needs to work in a quiet environment and get instruction in a one-on-one setting could not do either of those jobs. R. 41-42. When asked whether there would be other jobs that a person with that hearing impairment who was also of advanced or even closely approaching retirement age with more than a high school education, Mr. Schmidt responded that there are no such jobs in a sales setting, or an office setting, or a department store setting. R. 42.

However, Mr. Schmidt identified three positions that are available in the economy for which Mr. Garcia's skills could be transferred without substantial vocational adjustment: administrative assistant (6,700 jobs in Colorado, 136,000 nationally); merchandise distributor (2,500 jobs in Colorado, 175,000 nationally); and administrative clerk (11,000 jobs in Colorado, 500,000 nationally). R. 42-44. Mr. Schmidt acknowledged that in all these jobs an individual would have to be able to communicate effectively by phone, including correctly taking a message off voice mail. R. 48-49. The person would also have some skills on the computer, and he also conceded that to the extent Mr. Garcia lacked those skills, it would be harder at his age to learn them. R. 53. Mr. Garcia testified that he used e-mail, knew entry level Excel, and sometimes used the Internet at home. He did not use Word or WordPerfect. R. 56-58. Mr.

5

Schmidt testified that he believed Mr. Garcia could learn computer skills needed for a new position with some training. R. 59.

The ALJ, Jennifer B. Millington, issued her written decision to find that Mr. Garcia was not disabled or entitled to receive benefits on August 20, 2010. R. 11-23. The Appeals Council denied review of the ALJ decision. R. 1. Mr. Garcia's appeal to the Court was filed on August 23, 2011. After full briefing was completed by the parties on March 21, 2012, the case was assigned to this Court. On May 3, 2012 the Court referred the case to Magistrate Judge Tafoya. Her recommendation was issued on September 12, 2012. Mr. Garcia filed a timely objection, and on October 12, 2012 the Commissioner filed a response. [#21].

As indicated, this process began with Mr. Garcia's application for benefits on December 18, 2008, and as indicated below, the process is not over yet. I am well aware of the importance that disability claims have to claimants. Regardless of the merits of their cases, they deserve better.

**Standard of Review**

An appeal of the Commissioner's denial of disability benefits is based upon the administrative record and briefs submitted by the parties. The role of the district court is to examine the record and determine whether it "contains substantial evidence to support the Secretary's decision and whether the Secretary applied the correct legal standards." *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998). A decision cannot be based on substantial evidence if "it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988). Substantial evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561

F.3d 1048, 1052 (10th Cir. 2007).  Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

In this case the magistrate judge applied that standard.  However, Mr. Garcia objects to the magistrate judge's recommendation that the Commissioner's decision be affirmed.  Following the issuance of a magistrate judge's recommendation on a dispositive matter the district court judge must "determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  The district judge is permitted to "accept, reject, or modify the recommended disposition; receive further instruction; or return the matter to the magistrate with instructions."  *Id.*  To preserve an issue for *de novo* review, the objection must be specific enough to "focus the district court's attention on the factual and legal issues that are truly in dispute." *One Parcel*, 73 F.3d at 1060.  The Federal Magistrates Act does not "require any review at all, by either the district court or the court of appeals, of any issue that is not the subject of an objection."  *Thomas v. Arn*, 474 U.S. 140, 149 (1985).

**Conclusions**

Mr. Garcia raises three objections to the magistrate judge's recommendation, which I will consider based upon my de novo review of the record and the briefs.

I.      WAS THE ALJ'S CREDIBILITY DETERMINATION ERRONEOUS?

The ALJ found that Mr. Garcia's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extend they are inconsistent with the above residual functional capacity assessment." Regarding the later, she found that he has "the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: claimant can hear and

understand simple oral instructions and communicate information, but needs to have instructions given to him in a quiet, one-on-one environment and avoid loud background noises." R. 18.

Mr. Garcia argues that this credibility assessment lacked substantial evidence. An appellate court generally gives great deference to the credibility determination of the finder of fact. However, the determination must be supported by substantial evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). In my review of the record I found absolutely nothing to suggest that Mr. Garcia's descriptions of his hearing problems was in any way lacking in credibility. His work history demonstrates that he is not one to shirk hard work. His statements regarding his activities notwithstanding his hearing difficulty were refreshingly candid, and they were consistent with the observations of his wife.

The impact of his hearing loss on his job at Gillette was supported by two men who supervised him at different times, both before and after Gillette was acquired by Procter & Gamble. The ALJ downplayed the supervisor letters, suggesting that "such statements are considered to be an extension of the claimant and their statements alone clearly fail to outweigh the other elements of the record that are found to be adverse to the claimant." R. 21. I have no idea what the ALJ meant by "extension of the claimant." These were individuals who knew Mr. Garcia's work first-hand. Mr. Goulet in particular considered Mr. Garcia to be a talented and able employee; but he acknowledged the impact the hearing loss had had on Mr. Garcia's continuing ability to do the job successfully. Such statements in no way deserve to be minimized.

However, despite the unfortunate use of the word "credibility" in her opinion, a fair reading of the decision as a whole is not that Mr. Garcia was in any sense misrepresenting or overstating his disability, but that his condition was not inconsistent with an ability to work in a

8

setting where he could receive instructions either in writing, such as by email, or verbally in a quiet, one-on-one environment. I agree. Nothing in the record suggests that Mr. Garcia himself disagrees with that. The medical evidence he submitted in early 2009 (Wilson, Sweetman, Picerno) is not, at least on its face, inconsistent with that—as the ALJ noted. R. 20.

Likewise, a vocational evaluation conducted by Joseph B. Blythe, M.A., C.R.C. on June 23, 2010 likewise is not inconsistent with the ALJ's RFC assessment. Mr. Blythe noted that Mr. Garcia stated that he can work in quiet offices or libraries, which are usually rated at 30 dBs. R.206. He was able to converse with Mr. Blythe by telephone by placing himself in a quiet environment and utilizing amplified levels on the phone. *Id.* Mr. Blythe concluded, as did the vocational expert Mr. Schmidt at the ALJ hearing and ultimately the ALJ as well, that Mr. Garcia could not return to his usual and customary occupation because of the noise levels. *Id.* at 206-07. Unlike Mr. Schmidt, however, Mr. Blythe did not express an opinion regarding Mr. Garcia's ability or inability to work in some other setting. *Id.*

In sum, while I surely find no support in the record for any opinion that the testimony or statements of Mr. Garcia were not credible, I do not conclude that that was the ALJ's intent. I cannot find any good basis to remand for further assessment of Mr. Garcia's credibility.

II.   WAS THE DETERMINATION THAT MR. GARCIA'S SKILLS WERE TRANSFERRABLE REASONABLE?

Notwithstanding the wording of the argument, the question is not whether the determination was "reasonable" in the abstract but whether it was supported by substantial evidence. I conclude that the record that ostensibly supports the ALJ's finding that Mr. Garcia could perform the three positions identified by the vocational expert, Mr. Schmidt, is not clear.

It is absolutely clear that Mr. Schmidt opined that Mr. Garcia could not perform his former work. The ALJ does not disagree with that. At that point Mr. Schmidt's testimony became less than clear. As indicated above, the ALJ then asked whether a person whose hearing limited him to work in a quiet environment and get instruction in a one-on-one setting, and who was of advanced or near retirement age, could do other jobs. R. 42. Mr. Schmidt answered, "No, Your Honor. Not with the – with the hearing limited to a one-on-one with his transferrable skills in the sales field, I don't there (sic) would be any other occupations that he could do that would reduce the noise level to below the moderate level that he could understand and be employed in a (sic) office setting or a sales setting or department store setting." R. 42. He was not asked to explain what he meant by an office setting.

He did go on, in response to questions by the ALJ, to identify three positions to which Mr. Garcia's skills would transfer with some additional training. R. 42-44. However, he did not expressly state that those three jobs could, or could not, be performed in a setting that would accommodate Mr. Garcia's hearing loss. *Id.* His testimony about those positions essentially focused on the skills required. *Id.* ALJ then asked whether there are jobs at the "medium level" or above that could be done with one-on-one instruction and no loud background noise, and he said that a person would have a very difficult time to eliminate background noise. R. 44. Perhaps the implication from all this is that the three jobs were less skilled, that Mr. Garcia's skills would transfer to them with additional training, and they would accommodate his hearing loss. However, whether that is what Mr. Schmidt meant, and how it squares with his earlier opinion that he could not perform work in an office setting, was not clear.

Counsel then proceeded to ask a number of questions, largely focusing on the skills required to be an administrative assistant, which was one of the three identified jobs. In the

course of that discussion, however, and as noted above, the expert acknowledged that the three positions require the ability to answer the phone, correctly interpret voice messages, and have some basic minimal computer skills. He believed that Mr. Garcia had or could acquire the computer skills, but neither he nor the ALJ had much to say about the phone and voice message components. The expert was not asked whether a person with hearing loss such as Mr. Garcia's could handle those requirements in the three identified positions. His responses to counsel's questions about various things that would "erode" the numbers of jobs in those categories did little to clarify it. *See* R. 50-52.

The assumption that Mr. Garcia had both the skills and the hearing ability to perform one of the three types of jobs listed by the vocational expert, and to obtain and successfully perform such jobs notwithstanding his age, was a key to the ALJ's decision. Because the support for this assumption in the record is unclear at best, I conclude that the denial decision should not be affirmed on this record.

### III. WAS THERE SUFFICIENT EVIDENCE REGARDING THE EXERTIONAL LEVELS REQUIRED TO MAINTAIN SUBSTANTIAL GAINFUL EMPLOYMENT?

Counsel argues that "the Administrative Law Judge's finding that Garcia is capable of a 'full range of work at all exertional levels,' is devoid of support in the record." Opposition at 4. He criticizes the ALJ for impliedly finding that he can perform "very heavy work," meaning lifting objects weighing more than 100 pounds with frequent lifting or carrying of objects weighing more than 50 pounds. Counsel cites Mr. Garcia's age. The record shows that Mr. Garcia was 61years old when he left Procter & Gamble, 63 years old when the ALJ hearing occurred, and 65 years old at his Date Last Insured. There is no support in the record, counsel

argues, for a finding that a man of that age who has worked at a sedentary job and who is diabetic could handle that type of work. *Id.*

This is a "straw man" argument. The ALJ's finding that he is capable of a "full range of work at all exertional levels," R. 18, might be a bit of a stretch, but that is irrelevant to this case. No one suggests that Mr. Garcia should have been, during the relevant period, engaging in a job that requires very heavy lifting. The important thing is that Mr. Garcia has never claimed that he has a physical infirmity other than his hearing loss that adversely impacts his ability to work. He golfs, fishes, hunts, goes to football games, and does work in the home. Although he is diabetic, the ALJ's finding that this has not interfered with his ability to work, R. 17, has not been challenged. The Court rejects this argument entirely.

**Order**

This is not an easy case. On the one hand, we have a hard-working and credible man whose career was cut short by hearing loss. On the other hand, persons with hearing loss, including persons who have never been able to hear or who have lost their hearing entirely, do find jobs and perform productive work. The ALJ was entirely right that there was no medical support in the record confirming that Mr. Garcia could not perform any work. Rather, it appears that he could work if the right job were available, i.e., a job where he could work in a quiet environment and receive any necessary instructions in writing or in a one-on-one setting with a supervisor willing to speak in a loud voice.

The question, however, is whether there were jobs available in the economy during the relevant period that fit the <u>combination</u> of Mr. Garcia's hearing loss, his skill set, his ability to develop any necessary new skills, and his age. Although I conclude that the magistrate judge's recommendation was thorough and thoughtful, and I agree with it in most respects, I ultimately

conclude that this central question was not adequately explored. Accordingly, the Court remands this case for further evidence and analysis of that question.

DATED this 16th day of January, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge